162

## NATIONAL LABOR RELATIONS BOARD v. SCHMIDT BAKING CO., Inc.

### No. 4798.

Circuit Court of Appeals, Fourth Circuit.

June 18, 1941.

Gerhard Van Arkel, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, Owsley Vose, and William F. Guffey, Jr., all of Washington, D. C., Attys., National Labor Relations Board, on the brief), for petitioner.

Herbert G. Marvin, of Philadelphia, Pa. (Kenneth Souser, of Philadelphia, Pa., on the brief), for respondent.

Before SOPER, DOBIE, and NORTHCOTT, Circuit Judges.

### PER CURIAM.

This case comes before the court on the petition of the National Labor Relations Board to enforce an order issued by it against Schmidt Baking Company, Inc., as an employer of labor; and the latter contends that the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., is not applicable to it and therefore the petition should be dismissed. The Baking Company operates baking establishments at Baltimore and Cumberland, Maryland, and owns all the stock of another corporation similarly engaged in Martinsburg, West Virginia. Only the Baltimore plant, employing 120 inside employees and 59 driver-salesmen, is involved in this proceeding. All three plants are under the general supervision of the same executive officers, with a local manager in charge of each plant. Flour, milk and wrapping supplies for all the plants are purchased at Baltimore. Other supplies and materials are negotiated for by each individual plant, but the bills for the goods are paid at the Baltimore office.

During 1939, the Baking Company purchased and caused to be shipped to its Baltimore plant from twenty states of the union, more than $390,000 worth of ma-

terials and supplies, which represented approximately 75 per cent of such purchases. During this year the Baking Company also made interplant shipments of 190,677 pounds of raw materials and supplies, of which 91,757 pounds were shipped between its Maryland and West Virginia plants. The entire output of the Baltimore plant, worth approximately one million dollars annually, is disposed of within the state of Maryland; 35 per cent of the $300,000 worth of goods produced annually at the Cumberland plant and 74 per cent of the $300,000 produced annually at the Martinsburg plant are sold and delivered to customers located outside the state in which the goods are produced.

From these facts it becomes clear that the Baking Company is engaged in interstate commerce, and that a stoppage of its operations through industrial strife would be likely to result in the interruption of or interference with the free flow of such commerce. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 41, 42, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. The defense of the Baking Company is based upon the ground that the industrial dispute, which gave rise to the charges preferred by the Labor Board, occurred at the Baltimore plant, whose products are sold only in the state of Maryland, and hence the operation of this plant does not affect interstate commerce except insofar as it involves the importation from outside the state of 75 per cent of the material used in the manufacture of the goods. It is said that this fact is insufficient to confer jurisdiction upon the Board over an establishment which is otherwise local and intrastate in character.

In our opinion, this contention cannot be sustained. It was held in Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954, that the statute applied to a cannery which obtained all of its fruits and vegetables locally, but shipped substantial quantities of its products in interstate and foreign commerce. The situation there considered was the converse of the case at bar, and as we said in Newport News Shipbuilding & Dry Dock Co. v. National Labor Relations Board, 4 Cir., 101 F.2d 841, 843: "* * * a sufficient ground for regulation appears in the effect of the purchases on interstate commerce, which is within the power and duty of Congress to regulate and protect. * * * There

can be no difference in principle between the case in which manufacture precedes and that in which it follows interstate commerce. If the flow of commerce is obstructed by labor disputes, it can make no difference from which direction the obstruction is applied."

Moreover, the operation of the Baltimore plant may not fairly be treated as an enterprise separate and apart from the other two plants owned and operated by the employer. The three plants are not run as separate enterprises, but as parts of a single enterprise controlled and directed by the officers of the Baking Company in Baltimore; and it is not denied that interstate shipments of materials and supplies took place between the plants, and substantial quantities of the finished products of the Cumberland and Martinsburg plants were shipped and sold in interstate commerce. In Virginia Electric & Power Co. v. National Labor Relations Board, 4 Cir., 115 F.2d 414, we rejected the similar claim of the employer that its gas department should be regarded as purely local and separate from its interstate electric operations, and we held that wage controversies or unfair labor practices in one department of such a business would have repercussions in other departments, and that disputes affecting the interstate commerce in which the company was engaged would be avoided only if the rights of all the employees were properly safeguarded. That observation, we think, is applicable also to this case.

█ There is no doubt that the Baking Company engaged in unfair labor practices in violation of Section 8 (1), (3) and (5) of the Act. 56 of 59 driver-salesmen, prior to July 5, 1939, signed application cards designating Truck Drivers and Helpers Local Union No. 355, an organization affiliated with the American Federation of Labor, as their bargaining representative; and hence the Board found that the union was lawfully authorized to represent them. The evidence was ample that in May, 1939, the local union submitted proof of its authority to represent the employees, which was accepted by representatives of the employer. Some conferences between representatives of the two parties took place in May and June of 1939, looking towards the formation of a contract covering conditions of labor, but on July 5, 1939, the president of the Baking Company summoned the driver-salesmen to a meeting at

the Baltimore plant and told them that they should have come to him before joining the union, that there was no need to pay dues to the union, and that he would give them what the union was seeking on their behalf. He announced that he would not enter into a closed shop contract with the union, and did not want "to sell the men up the river to the union". On the following day when he was approached by representatives of the union to complete the negotiations, he stated that he would not sign anything and that "all bets were off". The Board was justified upon these facts in finding that the employer had refused to bargain collectively with the union in violation of Section 8 (5) and (1) of the Act.

The only justification for this conduct offered by the employer is the contention that prior to July 5, 1939, the union had ceased to represent a majority of the driver-salesmen; but there was no substantial evidence to support this contention. It was based only upon the testimony of the president of the Baking Company that he had become convinced from rumors flying around the plant that a majority of the employees no longer desired to be represented by the union; and the lack of substantial foundation for the contention became all the more clear when the Baking Company rejected the union's suggestion that the question of representation be resolved by a consent election. The refusal of the company to bargain collectively with the union was abundantly established.

■ The Board also found that the employer had violated Section 8 (3) and 8 (1) of the Act by discharging John J. Hasenkamp, one of its driver-salesmen, because of his union activity, and the evidence substantiates the finding. Hasenkamp was employed by the Baking Company in 1931. He joined the union in 1937 and was active in its membership campaign. He again joined the union in February, 1939, and during May of that year, secured 42 of the 56 membership applications signed by the driver-salesmen. He became president of the union in May or June, 1939, and was one of the committee participating in the negotiations between the Baking Company and the union. During July and Au-

gust he was summoned to the president's office and urged not to join the union because it would not do him any good. He was also told to quit his employment if he was not satisfied. On September 18, 1939, he was called into the president's office and informed that he was discharged because he had given discount to a customer contrary to the company's rule, and had broken a spring on his delivery truck, and had a low sales record. The president of the company, however, admitted at the hearing that neither the granting of the discount nor the breaking of the spring, considered singly or together, were sufficient causes for the discharge. But he maintained that the low sales record was sufficient cause. The evidence, however, indicated that for the year prior to the discharge 10 of the 59 employees earned less than Hasenkamp, but they were nevertheless retained as employees. Moreover, there was no marked trend for the worse in Hasenkamp's sales during the period under examination, since his weekly earnings during seven of the eight weeks immediately preceding his discharge were higher than his weekly average over the entire period. Under these circumstances, we conclude that the Board was justified in finding that Hasenkamp's discharge was due to his activity on behalf of the union and his leadership in its affairs.

The order of the Board required the employer to cease and desist from refusing to bargain collectively with the union, and from discouraging membership therein, or in any other manner from interfering with its employees in the exercise of their rights to self organization under the act. The order also required the employer to take affirmative action by bargaining with the union, and by offering Hasenkamp immediate and full reinstatement and making him whole for any loss of pay he had suffered by reason of his discharge, and also to post the usual notices in its Baltimore plant with respect to its compliance with the Board's order. Since the order in these respects was justified by the findings of the Board based upon sufficient evidence, it will be enforced by a decree of this court.

Affirmed.