## PEOPLES MOTOR EXPRESS, Inc. v. NATIONAL LABOR RELATIONS BOARD.

### No. 5687.

Circuit Court of Appeals, Fourth Circuit.

Jan. 31, 1948.

J. F. Flowers and Henry L. Strickland both of Charlotte, N. C., for petitioner.

Ben Grodsky, Atty., National Labor Relations Board, of Washington, D. C. (David P. Findling, Associate General Counsel, and Ruth Weyand, Acting Asst. Gen. Counsel, National Labor Relations Board, both of Washington, D. C., on the brief), for respondent.

Before PARKER, SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This case is before us upon the petition of Peoples Motor Express, Inc. (hereinaf-

ter called petitioner), to set aside an order of the National Labor Relations Board (hereinafter called the Board) issued against petitioner under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. (hereinafter called the Act). The Board, in its answer to the petition, has requested the enforcement of its order.

We are called on to decide whether there was substantial evidence in the record to support the following findings of the Board: (1) That petitioner refused to bargain collectively with Local Union No. 71 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, affiliated with the American Federation of Labor (hereinafter called the Union) in violation of Section 8(5) of the Act; (2) That petitioner, by threats of economic reprisal and other acts and statements indicating hostility to the Union and tending to discourage membership therein, restrained and coerced petitioner's employees in violation of Section 8(1) of the Act; (3) That petitioner, in violation of Section 8(3) of the Act, discriminatorily discharged employees Humphries, Britt and Moyer, because of their leadership and activities in the Union.

Much of the evidence bears on all three of these findings and particularly the first two. On April 2, 1946, seven out of ten of petitioner's employees signed membership application cards designating the Union as their collective bargaining representative. On April 6, 1946, employees Humphries, Britt and Moyer, at the request of all the employees, called on James Thrower, petitioner's president and manager, to discuss improvements in working conditions. Thrower immediately manifested anger and said: "If you don't want to work the way I am working, you can get out;" and then to Humphries, spokesman of the group, Thrower stated: "I feel like you are responsible for the whole entire thing, and you are fired now." Britt, upon admitting that he, too, was in the Union, was also discharged by Thrower. Moyer then disclosed his Union membership and Humphries stated that all of petitioner's drivers and the mechanic had signed Union cards. Whereupon Thrower said: "Well, you are all fired. Every man who has his name on

a card is fired." Thrower also declared: "Before I will go to a Union, I'll park my trucks, close up my warehouse because I have all the money I need."

On April 8, 1946, when Humphries reported the results of this interview with Thrower to petitioner's other employees, they promptly quit work. Upon his arrival at the Charlotte, North Carolina, Terminal that morning, Thrower was informed by Humphries that the men were on strike and that only through the Union could the strike be settled. Thrower again expressed his feelings against the Union and threatened that he would sell out the business before he would deal with the Union. Thrower, however, told Humphries that if the employees would drop any connection with the Union then Thrower would sign individual 1-year contracts with them; but when this offer was referred to the employees by Humphries, they rejected the offer and Thrower was told of this rejection.

Later that same day, Herndon (an agent of the Union), accompanied by Humphries, Britt and Moyer, went to Thrower's office, identified himself and sought Union recognition. There were then 10 employees in the appropriate unit and Herndon showed Thrower Union designations of 8 of these employees. Thrower once more refused to recognize, or deal with, the Union, reiterating his previous statements that he did not wish his employees to join the Union.

Herndon thereupon sought the aid of the United States Conciliation Service. That night, a representative of the Conciliation Service arranged for a conference between the Union and Thrower, to take place the following day. At this meeting, held on April 9, 1946, it was agreed to hold a consent election. All eight of the eligible employees voted in this election, held on April 30, 1946, when 5 employees voted against, and three employees in favor of, the Union.

Even in the brief period between Thrower's first interview with Herndon on April 8 and the conference held the next morning, April 9, Thrower endeavored with some success to persuade his employees to

sign individual 1-year contracts which provided for better jobs and increased salaries and were conditioned upon the abandonment of the Union by these employees. Between the conference and the election, Thrower actively renewed (again with some success) his anti-union tactics, by threats and offers of favorable individual contracts to those employees who would desert the Union. On the ground that Thrower's coercive practices had prevented a free election, timely objections to the election of April 30 were filed by the Union, and after an investigation, the Regional Director, on June 26, 1946, set aside the election.

Upon such a record, we must hold that there was substantial evidence to support the first two findings of the Board: (1) That petitioner refused to bargain collectively with the Union in violation of Section 8(5) of the Act; and (2) That petitioner, by threats of economic reprisal and other anti-union acts and statements, coerced its employees in violation of Section 8(1) of the Act. We, therefore, must uphold these findings and we must grant the enforcement of these parts of the Board's order which directed the petitioner to bargain collectively with the Union and to cease and desist from its unfair labor practices, discouraging membership in the Union.

The conclusions we have thus reached find ample support in the authorities. For representative cases, see Thomas v. Collins, 323 U.S. 516, 527-538, 65 S.Ct. 315, 89 L.Ed. 430; J. I. Case Co. v. National Labor Relations Board, 321 U.S. 332, 337, 64 S.Ct. 576, 88 L.Ed. 762; National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 477, 62 S.Ct. 344, 86 L.Ed. 348; National Labor Relations Board v. Waterman S. S. Corporation, 309 U.S. 206, 218, 219, 60 S.Ct. 493, 84 L.Ed. 704; National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 270, 58 S.Ct. 571, 82 L.Ed. 831; National Labor Relations Board v. Blair Quarries, 4 Cir., 152 F.2d 25, 26; Wallace Corporation v. National Labor Relations Board, 4 Cir., 141 F.2d 87, 90, affirmed 323 U.S. 248, 253–255, 65 S.Ct. 238, 89 L.Ed. 216; National Labor Relations Board v. Clarks-

burg Pub. Co., 4 Cir., 120 F.2d 976, 979; Atlas Underwear Co. v. National Labor Relations Board, 6 Cir., 116 F.2d 1020, 1023; National Labor Relations Board v. Asheville Hosiery Co., 4 Cir., 108 F.2d 288, 291.

This brings us to our last question —(3) Was there substantial evidence to support the Board's finding that petitioner, in violation of Section 8(3) of the Act, discriminatorily discharged employees Humphries, Britt and Moyer because of their activities in the Union. Since these three men were discharged at different times, under somewhat different circumstances, we take up each discharge separately.

Humphries was the unquestioned leader of, and spokesman for, the Union. That he, to a greater extent than any other employee, vexed Thrower, is hardly open to doubt. At the time of his discharge, May 1, 1946, he had been employed by petitioner as a driver for seven years. On the very day after the election, he was assigned to drive a tractor which was older and less satisfactory than the tractor he had been accustomed to drive. Upon his *return from his first run with this inferior tractor, the day after the election,* Humphries reported to Thrower at the Charlotte Terminal and was forthwith discharged by Thrower, who gave no reason for the discharge beyond the bare remark: "I can't use you any more."

Petitioner, at the hearing, for the first time contended that Humphries had been discharged because he had damaged the transmission on the tractor he had been driving. There was nothing in the evidence to show that Humphries had a bad record as a careless driver. During his seven-year term of employment he had been only in very minor (and not unusual) road accidents; furthermore, it was never proved that Humphries was responsible for the damage to the transmission of the tractor.

The long arm of circumstance cannot here be overlooked. A study of the record convinces us that there is substantial evidence to support the Board's finding that Humphries was discriminatorily discharged by petitioner for his Union activities. See National Labor Relations Board v. Harris-Woodson Co., 4 Cir., 162 F.2d 97, 100;

North Carolina Finishing Co. v. National Labor Relations Board, 4 Cir., 133 F.2d 714, 717.

■ The discharge of Britt occurred on May 4, 1946, only three days after the discharge of Humphries. Next to Humphries, Britt seems to have been the most active supporter of the Union. On May 4, Thrower showed Britt a manifest dated January 31 and inquired about four tires listed in the manifest, which (according to the allegations of Thrower) had never been delivered. Once before, prior to the advent of the Union into the picture, Britt had been questioned by Thrower concerning these tires and his explanation (which was corroborated) had apparently been accepted by Thrower.

After a brief argument, when this old affair was revived by Thrower on May 4 (four days after the election), Thrower remarked that he, himself, would have to drive the truck assigned to Britt as he was not making any money on it, and he forthwith discharged Britt upon the spot. Britt's offer to check the manifest was summarily rejected and when Britt returned to the terminal two days later (the following Monday) with the purpose of tracing the shipment in question, he was told that petitioner could not find this manifest and that Thrower had issued instructions that Humphries and Britt were not to be permitted on the premises of petitioner.

The evidence here does not satisfactorily prove that these tires were actually lost, much less that any negligent conduct of Britt contributed to the loss. No documentary evidence whatever was introduced to support Thrower's allegations about the tires. The Board doubted that Thrower even believed that Britt was responsible for the loss of the tires. There is real significance in the time that Thrower elected to revive an ancient (and apparently forgotten) complaint, and make it serve as the proffered excuse or reason for Britt's discharge.

We must hold, therefore, that the Board's finding as to Britt, of discriminatory discharge due to Union activity, has substantial support in the evidence. See National Labor Relations Board v. Fairmont Creamery Co., 10. Cir., 143 F.2d 668, 672, certiorari denied, 323 U.S. 752, 65 S.Ct. 87, 89 L.Ed. 402; Hartsell Mills Co. v. National Labor Relations Board, 4 Cir., 111 F.2d 291, 292.

■ Finally we come to the discharge of Moyer, whose employment by petitioner covered the period from January to June, 1946. His treatment by Thrower, in the period right after the election, is in striking contrast to the treatment handed out to Humphries and Britt. A more desirable job was given to Moyer with a weekly salary increase from $45 to $65. After Moyer had been working at this new job for about three weeks, the truck he was driving was involved in a traffic accident which resulted in a dented fender. Thrower was not satisfied with Moyer's explanation of the accident.

Had Thrower been waiting for a pretext for Moyer's discharge, here it was. Moyer, however, was taken off the road and put to work, at a reduced salary, in the garage of the Charlotte Terminal. A few days later, Thrower permitted Moyer to resume his work on the road. Thrower then learned that Moyer had communicated some complaint against petitioner to the Interstate Commerce Commission and Thrower questioned Moyer about this.

On the next Saturday night, which was pay day, Moyer received only $44.70, whereupon he protested to Thrower concerning this alleged underpayment. Thrower then discharged Moyer, and, as an excuse or reason for the discharge, Thrower stated that Moyer was unable to get along with Yandal, manager of petitioner's Charlotte Terminal. When Moyer himself was questioned at the hearing as to the reason for his discharge, he testified:

"Q. You have testified that you were let go on account of personal reasons between you and Mr. Yandal, is that right, Mr. Moyer? That is all I want to know. A. You heard what I said first?

"Q. What do you say, now? A. I said Mr. Thrower fired me because me and Mr. Yandal couldn't get along together."

The discharge of Moyer did not occur until the lapse of five weeks from the election and more than four weeks after the

discharge of Humphries and Britt. The record discloses no unusual Union activity on Moyer's part during the period preceding his discharge. The election, which the Union had lost, had not then been set aside, and with Humphreys and Britt out of Thrower's way, his fears as to Union domination appear to have been, temporarily at least, lulled into security, and there was no imminent reason demanding the dismissal of Moyer.

We cannot hold that, as to Moyer, there is substantial evidence to support the finding of a majority of the Board that Moyer was discriminatorily discharged for Union activities. We agree with the contrary finding of Chairman Herzog of the Board.

Said Circuit Judge Wilbur, in National Labor Relations Board v. Citizen-News Co., 9 Cir., 134 F.2d 970, 974: "Circumstances that merely raise a suspicion that an employer may be activated by unlawful motives (in discharging an employee) are not sufficiently substantial to support a finding."

In Interlake Iron Corporation v. National Labor Relations Board, 7 Cir., 131 F.2d 129, 133, Circuit Judge Minton stated: "The Board also held that 'respondent failed to show that Bulich was a less efficient or less valuable employee than the employees in his occupational unit who received higher ratings.' We do not think any such burden rests upon the company. It was the burden of the Board to show that Bulich was not only discriminated against in his rating and therefore in the layoff, but that the discrimination was caused by his union activities. It is not sufficient for the Board to show that the system is capable of being used discriminatorily. It must go further and show that it was used discriminatorily and that the discrimination was because the employee upon whom the system was thus used was a union man and the discrimination was because of his union activities. This burden is not met by showing that the company was hostile to the union."

And Circuit Judge Parker, speaking for our Court, in Appalachian Electric Power Co. v. National Labor Relations Board, 4 Cir., 93 F.2d 985, 989, remarked: "* * *

substantial evidence is evidence furnishing a substantial basis of fact from which the fact in issue can reasonably be inferred; and the test is not satisfied by evidence which merely creates a suspicion or which amounts to no more than a scintilla or which gives equal support to inconsistent inferences."

The request of the Board for the enforcement of its order is granted, save as to that portion of the order which requires the reinstatement with back pay of the employee Moyer; the petition of Peoples Motor Express, Inc. to set aside the Board's order is granted only as to that part of the order dealing with Moyer. The Board's order as to Moyer must be deleted and then, with that modification, the order will be enforced.

Order modified and enforced.