**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**L. E. FARRELL COMPANY, Inc., Respondent.**

**No. 322, Docket 30146.**

United States Court of Appeals Second Circuit.

Argued April 7, 1966.

Decided May 2, 1966.

Hans J. Lehmann, Atty., N. L. R. B. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel and Nancy M. Sherman, Attorney, Washington, D. C., on the brief), for petitioner.

A. Pearley Feen, Burlington, Vt., for respondent.

Before FRIENDLY and HAYS, Circuit Judges, and CLARIE, District Judge.*

HAYS, Circuit Judge:

The Board found that respondent violated Sections 8(a)(1), 8(a)(3) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3) and (5).[1]

The Board ordered the respondent to cease and desist from the violations and to take certain affirmative action, including the reinstatement with backpay of ten employees.

We hold that the Board's findings are based upon substantial evidence in the record as a whole, and therefore enforce the order. See Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Respondent is engaged in the bottling of soft drinks at its plant in Burlington, Vermont. In June 1964 it had approximately thirteen non-supervisory employees at the Burlington Plant. At that time Patch, one of the employees, got in touch with Business Agent Raymond of Local 597 of the Chauffeurs, Teamsters, Warehousemen & Helpers Union for the purpose of discussing the unionization of respondent's plant. Raymond met with Patch and two other employees at Patch's home. Patch thereupon arranged an organizational meeting at which ten of respondent's thirteen employees signed authorization cards on behalf of the union; subsequently, two other employees signed the authorization cards.

On July 6, 1964, Raymond sent the following letter to respondent:

"In accordance with the Labor-Management Relations Act of 1947, as amended, this is official notification that a majority of your plant employees have of their own volition designated Local 597, Chauffeurs, Teamsters, Warehousemen & Helpers to act for them in all matters pertaining to hours, wages and other conditions of employment.

We have on this date submitted a petition to the National Labor Relations Board requesting a certification election.

---

* Of the District Court for Connecticut, sitting by designation.

1. "§ 158. Unfair labor practices.
   (a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
   *     *     *     *     *

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization *  *  *
   *     *     *     *     *
(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

A representative of the Local will be available to meet with you at any mutually agreeable time and place."

Respondent's president, Farrell, received the letter on July 7, but never replied to it.

*Violations of Section 8(a)(1).*

■ A few days after receiving the union's request for recognition respondent began a concerted campaign to thwart unionization of its plant. Foreman Sartwell[2] threatened employees King and Wells that they would lose benefits if the plant were unionized, and indicated to employees King and Bassi that they were under surveillance. Sartwell questioned employee Martin about "who started," and "who belonged to the union"; he told employee LaPlant that "a lot of guys will lose their jobs" if the plant is unionized; he threatened, on a number of occasions, that layoffs and loss of overtime would result from unionization. During the strike which followed the discharge of Patch (see *infra*), President Farrell asked employee Brice "Are you with them outside [i. e. the picketing strikers] * * * Did you sign the card?" These activities were calculated to frustrate the union's organization campaign by instilling fear of reprisals in the employees.

■■ It is unnecessary to go further into the evidence that supports the finding of the Board that the employer violated Section 8(a)(1). It is sufficient to say that the evidence is clearly substantial, and that, while some of the evidence is challenged by respondent, questions of credibility are for the Trial Examiner and the Board. See National Labor Relations Board v. Warrensburg Board & Paper Corp., 340 F.2d 920, 922 (2d Cir.1965).

*Discharge of Patch.*

Patch was hired by respondent in April 1963 and was assigned to various jobs such as sorting bottles and preparing cartons. A few months later he was made a bottle inspector because, in the words of President Farrell, he was "quite an intelligent chap * * * he fit into the picture better than anyone else that I had in the organization. In other words, it was sort of a promotion type job; it was a better job." His wages were increased from $1.25 to $1.40 an hour.

Patch shared the inspector's job with employee Bassi. One inspector would examine empty bottles as they passed along a conveyance line while the other attended to the pre-mix syrup; every two hours they would switch positions. Foreman Sartwell and employee Norton also did some inspection work either to relieve Patch or Bassi, or as replacements when one of the regular inspectors was ill.

During June and July 1964 Patch took a leading role in organizing respondent's employees. President Farrell and Foreman Sartwell were aware of Patch's leadership.

Sometime in June or July, 1964 (the date is disputed), Belfore, respondent's manager in Rutland, Vermont, who reported every day to President Farrell, sent him the following note:

"It seems a wk. or so ago a Mrs. Le-Blanc—Library ave., Rutland bought a bottle of Pepsi, claims it was dirty and her little girl got sick, they took the bottle to Dr. Beale, health officer, I talked with him he said it was greasy at bottom of bottle, told her to wait 24 hrs. see what would happen, these people are not much good, character very unreasonable, said they were going to sue me."

On July 17, 1964 ten days after respondent had received the recognition demand of the union, and in the middle of respondent's short busy season Patch was discharged, ostensibly because Far-

2. Respondents do not dispute the fact that Sartwell was a supervisory employee within the meaning of § 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11). An employer may be held answerable for coercive statements made by supervisory personnel. See, e. g., Irving Air Chute Company v. National Labor Relations Board, 350 F.2d 176, 179 (2d Cir. 1965).

rell considered him responsible for the dirty bottle which Mrs. LeBlanc had reported. The Board concluded that Patch was discharged because of his union activity; that "there is not an iota of evidence that Patch was at fault in [the bottle] incident."

Primarily Patch and Bassi, but also Foreman Sartwell and employee Norton, inspected respondent's bottles. All had previously been warned about passing contaminated bottles. Bassi, for example, had passed a bottle containing a razor blade. Sartwell acknowledged that once a bottle leaves the plant it is impossible to tell who inspected it.

Recently, in discussing the recurring problem of the discharge, on an otherwise permissible ground, of an employee engaged in union organization, we said that:

"[T]he General Counsel must at least provide a reasonable basis for inferring that the permissible ground alone would not have led to the discharge, so that it was partially motivated by an impermissible one." National Labor Relations Board v. Park Edge Sheridan Meats, Inc., 341 F.2d 725, 728 (2d Cir.1965).

See National Labor Relations Board v. D'Armigene, Inc., 353 F.2d 406, 409 (2d Cir.1965).

Farrell testified that he did not learn of the contaminated bottle incident until July 16 when he received Belfore's note. But Belfore, who learned of the incident on June 22, and who communicated with Farrell every day, began his undated note to Farrell by observing: "It seems *a wk. or so ago* a Mrs. LeBlanc * * *" (Emphasis added.) It would follow that, at a minimum, Farrell knew of the incident at the end of June or the very beginning of July.

Patch had been a satisfactory employee. As late as July 14 or 15, Sartwell told him that he was the logical candidate to replace Sartwell as foreman. Nevertheless, on July 17, Patch was discharged.

"The abruptness of a discharge and its timing are persuasive evidence as to motivation." National Labor Relations Board v. Montgomery Ward & Co., 242 F.2d 497, 502 (2d Cir.), cert. denied, 355 U.S. 829, 78 S.Ct. 40, 2 L.Ed.2d 41 (1957).

In these circumstances, the Board could properly find that the "permissible ground alone would not have led to the discharge * * *" National Labor Relations Board v. Park Edge Sheridan Meats, Inc., supra, 341 F.2d at 728; see Peoples Motor Express, Inc. v. National Labor Relations Board, 165 F.2d 903, 906 (4th Cir. 1948).

*Discharge of Strikers.*

Respondent violated Section 8 (a)(3) when it discharged Patch, and this violation triggered a strike by Patch's fellow employees. Respondent purported to discharge the strikers. The strike was, however, an unfair labor practice strike and the strikers were entitled to reinstatement even though replacements had been hired. See Mastro Plastics Corp. v. National Labor Relations Board, 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309 (1956).

*Violation of Section 8(a)(5).*

The one remaining issue is the propriety of the Board's order that respondent bargain collectively with the union. An employer violates Section 8(a)(5) if, absent a good faith doubt of the union's majority status, it refuses to recognize and bargain with a union which actually represents a majority of its employees. See National Labor Relations Board v. Gotham Shoe Manufacturing Co., 359 F.2d 684 (2d Cir. January 14, 1966).

On July 6, 1964 the union informed respondent that it represented a majority of respondent's employees and that "A representative of the Local will be available to meet with you at any mutually agreeable time and place." Respondent, although it makes no such

claim, may not have read this sentence as a request to bargain; the sentence in context (see p. 207 *supra*) is ambiguous. But the response of respondent was unambiguous.

Respondent ignored the union's letter and engaged in a course of conduct which the Board properly found was "calculated to dissipate the union majority." "The anti-union activity by the Company both reinforces the Board's conclusion that the Company refused to bargain and established that this refusal was in bad faith." Irving Air Chute Company v. National Labor Relations Board, 350 F.2d 176, 182 (2d Cir.1965). The Board's bargaining order gives the union no more than it was entitled to at the time of its July 6 recognition demand. In these circumstances, the Board must be upheld in its choice of remedy.

Enforcement granted.