NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

BRATTEN PONTIAC CORP.,
Respondents.

No. 12356.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 30, 1968.

Decided Jan. 15, 1969.

John D. Burgoyne, Attorney, N.L.R.B. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Marjorie S. Gofreed,

Attorney, N.L.R.B., on brief), for petitioner.

William B. Devaney, Washington, D. C. (Steptoe & Johnson, Washington, D.C., on brief), for respondent.

Before HAYNSWORTH, Chief Judge, and BOREMAN and WINTER, Circuit Judges.

WINTER, Circuit Judge:

On this petition to enforce an order of the Board, predicated upon findings of violations of §§ 8(a) (1) and 8(a) (5) of the Act, we conclude that the order should be enforced in part and set aside in part.

The company is an automobile dealer employing twelve salesmen. Prior to 1966, the salesmen were not members of any union, but they met collectively with their employer, from time to time, to negotiate hours, compensation, benefits and other terms of their employment.

In March, 1966, two of the salesmen visited the office of the union (Local 822, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America) stating that the salesmen had decided that they needed a union and requesting representation. By the next day, nine of the twelve salesmen had signed authorization cards granting the union the right "to represent me as my collective bargaining agent until further notice."

On March 8, 1966, the union wrote to the company advising that it represented a majority of its employees, offering to prove its majority status, advising that it was filing a representation petition but could withdraw it if the company agreed to a card check, and requesting recognition and bargaining. The company acknowledged the letter, but made no further immediate reply.

Next in the chronology of events, the salesmen requested a meeting with George W. Bratten, president of the company, and a meeting with all of the salesmen occurred at dinner at a local restaurant on or about March 20.[1] At dinner, the salesmen expressed dissatisfaction with employment conditions, and Bratten polled them as to their complaints. During the course of the discussion, he said, "Why pay someone to negotiate for you when you are grown men, you can negotiate yourself with me." Bratten paid for the dinner for the entire group.[2]

A day or two later, Bratten submitted to the salesmen for their signatures a "Pay Plan" to be effective the first of the next month (April 1, 1966). It increased company payments for health insurance, increased vacation allowances, increased bonuses and decreased the basic commission on the sale of used cars. The new pay plan also contained an agreement that for the next two years the salesmen "will not enter into any combination or association with the intent or purpose of injuring the company or its property, and that they will not be a party to any hostile act against the company." After deliberation, but before March 31, all the salesmen signed the new pay plan and concluded to withdraw their authorizations to the union. The company's vice president requested one of the salesmen to call the union so that it would know of the salesmen's decision.

The union, however, took the position that it was too late to revoke the authorizations so that at a hearing on the representation petition, on March 31, the parties agreed to a consent election. The election was held April 14; the union lost nine to three. The company thereafter made no effort to bargain with the union. The union filed objections to conduct affecting the results of the election and, in due course, the regional director of the Board issued an unfair labor practice complaint charging, *inter alia*, violation of §§ 8(a) (1)

---

1. The trial examiner declined to make any finding as to whether the salesmen initiated the meeting. The record shows no dispute that they did.

2. Previous direct bargaining sessions were also held at a restaurant, and Bratten usually paid for the dinners.

and 8(a) (5). Copies of the union's objections were mailed to Edgar A. Tugman, the person whom the company had advised represented it when it acknowledged the union's initial request to bargain. Tugman had also signed the stipulation for a consent election on behalf of the company.[3] No copies were served on any other representative of the company.

On these facts, the Board concluded that the company had violated § 8(a) (1) of the Act by granting the salesmen substantial increases in employment benefits to induce them to defect from the union. The Board also ordered the election set aside because of the granting of benefits. Further, the Board concluded that the company violated § 8(a) (5) by refusing to bargain, and it ordered the company to recognize and bargain with the union on request.

■■■ There was substantial evidence to support the conclusion of a § 8(a) (1) violation. The actions of the salesmen smack of a perfidious attempt to make the union a tool to assist them in their direct bargaining efforts. Although they had recently authorized the union to act in their behalf, they initiated direct bargaining with the company and invited the major part of the company's response. If this were all that the case consisted of, we might have difficulty in sustaining the Board's conclusion that the company interfered with the § 7 rights of the employees to unionize, because the *bona fides* of the salesmen's interest in the union would be highly questionable and we could as well conclude that the salesmen desired to exercise their § 7 right not to be represented by a union. But, the record is clear that the company, when presented with the opportunity to deal directly with its salesmen, went well beyond any permissible limit. Leaving aside Bratten's statement at the dinner, the permissible inference which may be drawn when benefits are unilaterally conferred while a request to bargain is pending[4] and the assiduousness of the company's vice president in seeing that the union learned that its constituency had defected, we think that § 8(a) (1) was violated when the company extracted from its salesmen a two-year agreement not to enter into "any combination or association with the intent or purpose of injuring the company or its property, etc.," as the price they must pay for increased employment benefits. Although counsel for the company argued that the "agreement," which was part of the pay plan, did not constitute a yellow-dog contract, he was unable to suggest any other reasonable interpretation. True, there was no direct evidence of precisely what the contract language was intended to mean, but from the breadth of the language, its advent so closely after the union's request for recognition, the evident attitude of Bratten as exemplified by his statement at the dinner, and the company's obvious desire to insure that the union receive notice of the decision of the employees, we view it as a thinly-disguised attempt at preventing salesmen from joining a union or engaging in any union activity for a period of two years. This § 8(a) (1) proscribes.[5]

---

3. The company's characterization of Tugman as its representative to whom the union's request for recognition and bargaining had been referred and Tugman's appearing for the company in formal stipulations before the Board are ample evidence of his authority to receive, for the company, the union's objections to the election.

4. In Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944), and Overnite Transportation Company v. N. L. R. B., 372 F. 2d 765 (4 Cir.), cert. den. 389 U.S. 838, 88 S.Ct. 59, 19 L.Ed.2d 101 (1967), the wage increase held to be a violation of § 8(a) (1) was granted when the union was the recognized bargaining agent. As we show later in the text, the employer here was justified in withholding recognition at the time it granted wage increases.

5. Section 8(a) (1) constitutes employer interference, restraint or coercion of an employee's rights guaranteed by § 7 an "unfair labor practice." Section 7, *inter alia*, guarantees "the right to self-organization, to form, join or assist labor organizations, to bargain collectively * * and to engage in other concerted ac-

See also, 29 U.S.C.A. § 103, which renders such an agreement unenforceable.

█ We think that there was no violasion holds that, absent other affirmative sion hold that, absent other affirmative evidence to show employer knowledge that its employees desire union representation, an employer properly may have a good faith doubt as to the union's majority status and withhold recognition pending the result of a certification election, because "authorization cards are such unreliable indicators of the desire of the employees." Breaker Confections, Inc. v. N. L. R. B., 402 F.2d 499 (4 Cir. 1968); Benson Veneer Co. v. N. L. R. B., 398 F.2d 998 (4 Cir. 1968); General Steel Products, Inc. v. N. L. R. B., 398 F.2d 339 (4 Cir. 1968); N. L. R. B. v. Heck's Inc., 398 F.2d 337 (4 Cir. 1968); N. L. R. B. v. Gissel Packing Co., 398 F.2d 336 (4 Cir. 1968);[6] N. L. R. B. v. S. S. Logan Packing Company, 386 F.2d 562 (4 Cir. 1967); N. L. R. B. v. Sehon Stevenson & Co., 386 F.2d 551 (4 Cir. 1967); N. L. R. B. v. Heck's Inc., 386 F.2d 317 (4 Cir. 1967).

█ We do not rest solely on the unreliability of the cards, however, because in this case there is more. As previously stated, the salesmen initiated direct bargaining and they did so subsequent to the union's demands. Thus, supportive of the doubt inherent in the cards, the employer had direct evidence that the salesmen had made no irrevocable choice to be represented by the union and, indeed, had affirmative knowledge that they did not so desire to be represented. There was, in our view, ample evidence to justify the employer's reluctance to bargain with the union, and its failure to do so constituted no violation of § 8 (a) (5).

Enforcement granted in part and denied in part.

tivities * * *." It follows that a two-year contractual restraint on certain § 7 rights constitutes a violation of § 8(a) (1).

6. The Supreme Court granted certiorari in this and related cases on December 16, 1968, 393 U.S. 997, 89 S.Ct. 482, 21 L.Ed. 2d 462. That fact should not delay de-

cision here, because, as shown in the text, the result does not depend solely on the inherent unreliability of the authorization cards to support the employer's good faith doubt as to majority status of the union.

