## WILLIAMS MOTOR CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 12190.

Circuit Court of Appeals, Eighth Circuit.

July 2, 1942.

962

B. L. Sifford and S. F. Wadden, both of Sioux City, Iowa, for petitioner.

Louis Libbin, Atty., National Labor Relations Board, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Gerhard P. Van Arkel, Asst. Gen. Counsel, and Edward J. Creswell, Atty., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before STONE, SANBORN, and THOMAS, Circuit Judges.

STONE, Circuit Judge.

This is a petition to review an order of the National Labor Relations Board. Joined in the answer of the Board is a petition for enforcement of the order.

Petitioner is an Iowa corporation engaged, at Sioux City, Iowa, in the wholesale and retail sale of new and used automobiles, trucks, parts and supplies, and in servicing and repairing automobiles and trucks. As a "direct dealer," it handles Dodge and Plymouth products (cars, trucks, parts and accessories) under a contract with the producer (Chrysler Corporation, Dodge Division, of Detroit, Michigan). This contract covers parts of South Dakota, of Nebraska and of Iowa. It had a service department which did mechanical repair work, lubrication, painting, and car reconditioning and wherein 18 men were employed into July, 1939. In this department was a body and fender repair and reconditioning shop where the work was divided into such service for its cus-tomers and such service on used cars belonging to petitioner. In this shop, three men (Carlson, Fallon and Herbst) were employed to thus service customer cars and two men in such service on its own cars.

Early in 1939, Lodge 1426 of the International Association of Machinists, A. F. of L., began unionizing the service department. By July, 14 of the 18 men in that department were members, including all three in the customer section of the body and fender shop. In July, those three men were discharged and that section closed—thereafter, this class of work was cared for by contracts with outside concerns.

The order of the Board covered recognition of the above union, cease recognition of a company encouraged union, affirmative action concerning Carlson, Fallon and Herbst, and other matters.

Petitioner makes three attacks upon the order. The first is a blanket attack upon the jurisdiction of the Board based on the contention that petitioner is not engaged in interstate commerce and, therefore, without the limits of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. The second is upon those provisions of the order having to do with reinstatement and reimbursement of Carlson, Fallon and Herbst. The third is that, in any event, it is entitled to a modification of the order so as to provide for a present determination of whether Lodge 1426 is now the representative of the employees in the bargaining unit.

I. Interstate Commerce.

The petitioner presents this issue under two related headings: Do the activities of the petitioner bring it under the Act; and is there substantial evidence that a labor dispute in its service department would adversely affect interstate commerce? These may be considered together.

*Activities of petitioner.* Petitioner contends that "it is purely a local merchant," with all of its activities carried on and brought to completion at Sioux City except "in one small instance."[1] The essential evidence is as follows. The main business resulted from a contract with

---

[1] This instance is shipment by it in interstate commerce of $2,053.12 worth of parts and accessories from its place in Sioux City to out-of-State customers. The test period accepted in this controversy is a year, beginning November 1, 1938. During this period, the total sales of products and services was $574,923.60, of which the out-State sales are calculated as being 0.3571 percentum.

Chrysler Corporation, Dodge Division, of Detroit, Michigan.[2] This contract provided petitioner should be a "Direct Dealer" with right to purchase from Chrysler and to resell Dodge and Plymouth motor vehicles, parts and accessories within designated portions of Iowa, Nebraska and South Dakota. Petitioner was to provide and maintain facilities for selling and for "servicing" such vehicles in its territory. To this end, it was to procure and maintain sub-dealers, at places designated by Chrysler within its territory, who would buy vehicles, parts and accessories from it at wholesale. Without consent of Chrysler, it could sell no other line of cars. It must keep on hand at its place of business and with its sub-dealers an adequate supply of parts to meet requirements in its territory. All new vehicles were to be shipped to petitioner only upon its orders therefor "subject to approval and acceptance" at Detroit.

Under this contract, the actual method of operation was that petitioner notified Chrysler of the number of cars wanted; Chrysler notified petitioner cars were ready; petitioner notified Securities Acceptance Corporation (a finance concern at Sioux City) to buy the cars; Securities bought from Chrysler (taking title) and ordered a transportation company to pick up from Chrysler and deliver to petitioner the cars; on arrival of cars, petitioner executed chattel mortgage notes to Securities covering cars delivered; cars placed in petitioner's sales room for sale; when sold, petitioner paid Securities, the notes were cancelled, and title passed to it and from it to purchaser. The payments by petitioner to Securities are the price paid Chrysler for the car, the transportation charges, and interest on the money so used. All deliveries of and payments for cars sold by petitioner took place at Sioux City. Sub-dealers under petitioner in its territory were bound by contract to buy all cars from it. Some of these sub-dealers were located in Nebraska and in South Dakota and some citizens from out of Iowa bought cars from petitioner direct. These sales to sub-dealers amounted to 20% in value of the new cars handled by petitioner. Going to all purchasers of new cars was a limited service obligation in the form of

a "policy" or "guarantee" which provided for a limited servicing.

*Service department.* The entire business of petitioner was in one building separated by partitions for the several activities. The service department thus had a separate place or shop for repairing and reconditioning cars and trucks. This work was done on new cars (minor repairs), on used cars traded in to petitioner, and on any outside cars which might be brought in. Service on new or outside cars seems to be designated as "customer" cars. In this department were eighteen workmen doing different things—among others, a painter, two body and fender men who worked on petitioner's cars and three who worked on customers' cars. In its bookkeeping, petitioner divided its business into four entities: retailing cars, wholesaling cars, dealing in parts and accessories, and servicing—each entity being charged with its separate income, outgo and profit or loss. The sales entities could be operated without a service entity (although this was not usual with dealers like petitioner) by independently contracting for such service by outside concerns. Petitioner operated the service entity, as above, until in July, 1939, when it discharged Carlson, Fallon and Herbst (who were engaged in body and fender work on customer cars). Thereafter, this work was contracted to an outside concern except such unfinished work of that kind as was then on hand which seems to have been finished by those doing body and fender work on petitioner's cars. Its contract with Chrysler required petitioner to supply this service.

From the above, it appears that the major part of petitioner's business was closely related to interstate commerce. The basis of its business was handling the Chrysler Corporation cars which came from Detroit. The intervention of the Securities Acceptance Corporation does not break this relationship. Securities was not a dealer in cars but purely a financial agency utilized by petitioner. Independently, it neither initiated purchases nor received deliveries. Petitioner notified Chrysler of its needs and Chrysler notified it when the cars were ready for delivery. Securities ordered and arranged for transportation of such only and always when notified by petitioner. Interstate movement

[2] Out of a total sales of products and services of $574,923.60, $379,030.39 represented new vehicles, and $120,350.44

used cars. How far the used vehicles were connected with sales of new vehicles does not appear.

of these cars was really caused by and depended entirely upon petitioner.[3] This situation is enough to establish such relationship to interstate commerce as to bring petitioner within the Act. Added to this, is the effect of substantial sales of cars to its sub-dealers and their customers in other States.

While it is evident that petitioner could have operated its sales department without a service department, yet it saw fit, until into July, 1939, to have such department. The contract with Chrysler required it to furnish such services for the cars bought from Chrysler. The "guarantee" or "policy" given to each new car purchaser obligated petitioner to do a limited servicing on such cars. Thus it is clear that most of the repair work was directly (on new cars) or indirectly (on used cars traded in) connected with the sales business. In an analogous situation, the Supreme Court (National Labor Relations Board v. Virginia Elec. & Power Co., 314 U.S. 469, 476, 62 S.Ct. 344, 86 L.Ed. ——) approved a decision of the Fourth Circuit (115 F.2d 414, 415, 416) upholding the jurisdiction of the Board. Also see National Labor Relations Board v. Schmidt Baking Co., 4 Cir., 122 F.2d 162, 163. We think the Act applies to the situation here. Compare National Labor Relations Board v. Henry Levaur, Inc., 1 Cir., 115 F.2d 105, certiorari denied 312 U.S. 682, 61 S.Ct. 550, 85 L.Ed. 1120.

II. Reinstatement and Reimbursement.

Petitioner presents this matter in two contentions: No substantial evidence of discriminatory discharge of Carlson, Fallon or Herbst; and no basis for requirement of reinstatement or reimbursement even if the discharges were discriminatory.

■■ As to the discriminatory character of the discharges, there was a sharp conflict in the testimony. Petitioner urges that the sole reason for discharge was the unprofitable operation, for several months, of the customer body and fender work; and that only because thereof, it discontinued that work and put it out on contract. The Board urges the discharges were because of union activities of the three men. We have no power to weigh the

evidence except to ascertain whether the conclusion of the Board is supported by substantial evidence. We have examined the evidence and are convinced that there was such supporting substantial evidence. If a purpose in discontinuing this repair service was to get rid of union men, it was to that extent a subterfuge to violate the Act. See National Labor Relations Board v. Skinner & Kennedy Stationery Co., 8 Cir., 113 F.2d 667, 671.

■ In view of our conclusion that the Board is supported in its finding that the discharges were discriminatory under the Act, the second contention is, in essence, whether the Board can make the affirmative requirements it made here where petitioner abandoned that portion of its business in which the men worked for the purpose of ridding itself of these three union men. This is a matter of remedy. The power of the Board as to remedies must be found in the Act.

■■ Section 10(c) of the Act grants to the Board power "to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act [chapter]." "The Board not the courts determines under this statutory scheme how the effect of unfair labor practices may be expunged." National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 600, 61 S.Ct. 358, 366, 85 L.Ed. 368. The "central clue to the Board's powers" is the "effectuation of the policies of the Act." Phelps Dodge Corporation v. National Labor Relations Board, 313 U.S. 177, 191, 61 S.Ct. 845, 851, 85 L.Ed. 1271, 133 A.L.R. 1217. It is this "clue" which must be followed in finding whether a provision in an order of the Board is within its powers. In its choice of remedies to effectuate the policies of the Act, a wide range is necessary because the remedy must fit the particular situation of each case. As stated in the Phelps Dodge case, supra, page 194, of 313 U.S., page 852 of 61 S.Ct.: "A statute expressive of such large public policy as that on which the National Labor Relations Board is based must be broadly phrased and necessarily carries with it the task of administrative application. There is an area plain-

---

[3] The situation that title did not pass to petitioner until after delivery of the cars in Iowa is not material here. National Labor Relations Board v. Fainblatt, 306 U.S. 601, 605, 608, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014; National Labor Relations Board v. Henry Levaur, Inc., 1 Cir., 115 F.2d 105, 108, 109.

ly covered by the language of the Act and an area no less plainly without it. But in the nature of things Congress could not catalogue all the devices and stratagems for circumventing the policies of the Act. Nor could it define the whole gamut of remedies to effectuate these policies in an infinite variety of specific situations. Congress met these difficulties by leaving the adaptation of means to end to the empiric process of administration. The exercise of the process was committed to the Board, subject to limited judicial review. Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy. On the other hand, the power with which Congress invested the Board implies responsibility—the responsibility of exercising its judgment in employing the statutory powers."

▪▪▪ The discretionary power of the Board is to select any remedy which reasonably is adapted to effectuate the policies of the Act and fitted to the particular situation being dealt with by it. See Phelps Dodge case, supra, page 199, of 313 U.S., 61 S.Ct. 845, and National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 265, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307. This choice of remedies is a matter of fact which must be accepted unless unsupported by evidence. Phelps Dodge case, supra, page 195 of 313 U.S., 61 S.Ct. 845, National Labor Relations Board v. Pacific Greyhound Lines, 303 U.S. 272, 273, 58 S.Ct. 577, 82 L.Ed. 838. Unless the chosen remedy is clearly outside the power of the Board as applied to the particular situation, it should be sustained. In determining whether a particular remedy is justified in a particular situation, there may be many considerations. Among these, two are pertinent here, which are somewhat counterbalancing. One is the "restoration of the situation, as nearly as possible, to that which would have obtained but for the illegal discrimination" (Phelps Dodge case, supra, page 194 of 313 U.S., page 852 of 61 S.Ct.), and the provision of Section 10(c) expressly permitting reinstatement, with or without back pay). The other is the "dislocation of the business" of the employer. National Labor Relations Board

v. Lightner Publishing Corporation of Illinois, 7 Cir., 128 F.2d 237, decided May 6, 1942; Mooresville Cotton Mills v. National Labor Relations Board, 4 Cir., 97 F.2d 959, 963, and see Phelps Dodge case, supra, page 195 of 313 U.S., 61 S.Ct. 845.

This order of the Board was as follows:

"(c) Offer to Clifford Fallon, William Carlson, and John Herbst immediate and full reinstatement to their former or substantially equivalent positions, or to any other available positions for which they are qualified, without prejudice to their seniority or other rights and privileges previously enjoyed; and if no such positions are presently available, place them upon a preferential list and thereafter offer them employment as it becomes available, in the manner provided in the section entitled 'The Remedy';

"(d) Make whole Clifford Fallon, William Carlson, and John Herbst for any loss of pay they have suffered by reason of the respondent's discrimination against them, by payment to each of them of a sum equal to the amount which he normally would have earned as wages during the period from July 29, 1939, to the date of the offer of reinstatement, or placement upon the preferential list as provided in the section entitled 'The Remedy,' less his net earnings during said period; but without diminution on account of the closing of the body and fender shop."

The portion of "The Remedy" referred to in the foregoing quotation is as follows: "We have found that the respondent discontinued the operation of its body and fender shop and discharged Fallon, Carlson, and Herbst in order to discourage membership in the I. A. M., thereby discriminating in regard to their hire and tenure of employment. We shall, therefore, in accordance with our usual practice, order the respondent to offer them immediate reinstatement to their former or substantially equivalent positions, or to any other available positions for which they are qualified, without prejudice to their seniority and other rights and privileges. We shall further order that, in the event there are no positions available for which they are qualified, their names be placed on a preferential list and that they shall thereafter be offered employment in any positions for which they are qualified as such employment becomes available and before other persons are hired for such work; and that if the body and

fender shop is reopened, Fallon, Carlson, and Herbst shall be offered immediate employment therein. We shall also order the respondent to make whole Fallon, Carlson, and Herbst for any loss of pay they have suffered by reason of their discharge by payment to each of them of a sum of money equal to the amount which he would normally have earned as wages from July 29, 1939, to the date of the offer of reinstatement, or placement upon the preferential list as above provided, less his net earnings during said period."

■■■ There was no positive requirement to re-employ these men immediately. The requirements as to employment were alternative and conditioned upon the actual situation. If there were substantially equivalent positions or any other "available positions for which they are qualified," an offer of immediate reinstatement therein was required. If there were no such positions available, they were to be placed on a preferential list and to be first offered employment "in any position for which they are qualified as such employment becomes available" and, if the body and fender shop·be reopened, they were to be offered immediate employment therein. There was no requirement to discharge employed men to make places for these three; no requirement to employ them unless such services were needed; and no requirement to ropen the body and fender shop in order to furnish them employment. No compulsory change in petitioner's business was contemplated. Petitioner was permitted to conduct its business as it wished with the one requirement that these men should be offered such employment as they were qualified to undertake whenever there was need—immediate or in the future—of such service by petitioner. In short, the effect of the order is to restore these men to their previous status as nearly as this could be done without in any way "dislocating" petitioner's business or its method of conducting such business. We see nothing remotely unreasonable about these employment requirements of the order.

■■■ The other phase of the order has to do with reimbursement. This reimbursement was to begin with the date of discharges. Since the discharges were discriminatory under the Act, it is obvious that this date was proper for the beginning of reimbursement. The termination of reimbursement was in the alternative following: Upon "offer of reinstatement, or [upon] placement upon the preferential list." Petitioner could terminate the reimbursement at will. If it had suitable employment available, it could offer it. If it had no such employment, it had only to place the men on a preferential list. Such requirements were reasonable.

As to the requirements—both of employment and of reimbursement—there can be no doubt of their tendency to "effectuate the policies" of the Act. Reinstatement and reimbursement are expressly recognized in Section 10(c) as appropriate means of enforcing the Act, if the fact situation makes them reasonably suitable to that end. That they are here reasonably suitable is certain. Besides their intrinsic suitableness, the influence of the use of them may well here have gone beyond the three men immediately affected. See the illustration in the Phelps Dodge case, supra, page 193 of 313 U.S., 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217.

### III. Modification of Order.

■■■ This contention is that the order should be modified "to provide for a present determination of the bargaining representative." The entire supporting argument is as follows:

"The events complained of occurred in 1939 as did the designation of Lodge 1426. What the situation is three years later no one can say. It would be unfair to assume that Lodge 1426 still represents the men.

"This was done by the Court in National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799. Where so much time has elapsed and where so many changes can occur, it is the only proper thing to do to have a present determination of the question of representation."

There is no showing that any change in bargaining representative has taken place. The force of the argument is that lapse of time and that possible changes may have taken place to change the representative. This nebulous supposition is clearly insufficient. National Labor Relations Board v. P. Lorillard Co., 314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. ——, and cases cited therein; National Labor Relations Board v. Blanton Co., 8 Cir., 121 F.2d 564, 571. The situation in the cited National Licorice Co. case was entirely different; the Board did not oppose such modification in the Supreme Court (page 359 of 309 U.S., 60

S.Ct. 569, 84 L.Ed. 799); and the point was not discussed in the majority opinion.

### IV. Conclusion.

The petition to review should be denied and the petition for enforcement of the order should be granted and a decree entered for such enforcement.