The **SINGER COMPANY**, Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD**, Respondent.

No. 19837.

United States Court of Appeals, Eighth Circuit.

June 30, 1970.

Douglas L. Leslie, Atty., N. L. R. B., for respondent, Arnold Ordman, Gen. Counsel, N. L. R. B., Domonick L. Manoli, Assoc. Gen. Counsel, N. L. R. B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., and John I. Taylor, Atty. for N. L. R. B., were on the brief.

W. Kerby Bowling of Bowling & Sykes, Memphis, Tenn., for petitioner, Charles E. Sykes, Memphis, Tenn., on the brief.

**174**

Before VAN OOSTERHOUT, Chief Judge, and MATTHES and GIBSON, Circuit Judges.

GIBSON, Circuit Judge.

The Singer Company seeks to review and set aside an Order of the National Labor Relations Board issued against the Company on June 25, 1969, and reported at 176 NLRB No. 149. In its cross-application the Board has requested that the Order be enforced in full. We have jurisdiction of the proceedings under § 10(e) and (f) of the National Labor Relations Act as amended, 29 U. S.C. § 160(e) and (f), as the alleged unfair labor practices occurred in Truman, Arkansas.

The Board found that the Company violated § 8(a) (1) of the Act by coercively interrogating its employees about their union activities and by threatening employees with reprisals for their union support. The Board also found that the Company violated §§ 8(a) (3) and (1) of the Act by discharging Odis Jones and Corine Sullivan because of their union activities.

The Board ordered the Company to cease and desist from the unfair labor practices found, reinstate and make whole Jones and Sullivan, and further ordered that a representation election held February 1, 1968, be set aside and a second election be conducted under the supervision of the NLRB Regional Director.[1]

The Company is a New Jersey corporation with an office and plant at Truman, Arkansas, where it employs about 1600 people in the manufacture of sewing machine cabinets and other wood products. Union organizational drives were conducted at the plant in 1963, 1964, 1965, and 1966 by the Cabinet Makers Union,[2] but not without incident. In two previous cases the Company has been found by the Board to have engaged in unfair labor practices against the Union's organizational efforts.[3]

The instant case arose out of another union campaign which commenced in August 1967. On January 22, 1968, prior to the election, the Union began filing unfair labor practice charges. An election was conducted by the Regional Director on February 1, 1968, pursuant to a Stipulation for Certification Upon Consent Election, and the Union lost by a vote of 554 for and 909 against. After the election the Union filed objections to the conduct of the Company affecting the election. A Complaint was issued by the General Counsel and the objections were consolidated with the unfair labor practice allegations for trial.

A chronological summary of the incidents which gave rise to the Board's findings of unfair labor practices follows:

1. Shortly after the unionization campaign began in August 1967, Foreman Bill McMaster asked stockboy Jesse Crume whether he had signed a union card, to which Crume replied that he had not but intended to do so. Crume testified that McMasters then stated that the Company didn't want a union.

2. In October or November 1967, Foreman Earl Holley, in a conversation with employee Lloyd Pollard, a friend of his, referred to rumors about the union campaign and asked Pollard if he would help the Company. Pollard's answer was noncommittal. About a week later Holley removed some protruding union authorization cards from Pollard's hip

---

1. A second election was held on September 11, 1969, with the Union losing by a vote of 578 for and 807 against. The Union filed objections which were later withdrawn. On October 13, 1969, the results of this election were certified.

2. Cabinet Makers Local Union 2705, United Brotherhood of Carpenters and Joiners of America, AFL–CIO.

3. 153 NLRB No. 922; 158 NLRB No. 677. Another violation was found by the Board in 159 NLRB No. 220, but we refused to enforce the Board's finding of unfair labor practices. Singer Co. v. NLRB, 371 F.2d 623 (8th Cir. 1967).

pocket and questioned Pollard as to what they were. Holley testified that he thought the cards were religious literature as Pollard had previously brought such literature in the past and talked to Holley about going to church. When Pollard explained the cards were union cards, Holley asked what he was going to do with them. Pollard replied he was "going to get them signed, every one of them if I can." Holley replied that he didn't think Pollard was that bad off.

3. Although the testimony was controverted, the Trial Examiner credited the testimony of employee James Hancock that two or three weeks prior to the election he (Hancock) discussed the possible employment of his son with Company Supervisor Guster Davis. Davis purportedly told Hancock that he could get Hancock's son a job if Hancock, his wife and his son would agree to vote against the Union. Sometime later Davis commented to Hancock that the Union wouldn't do the employees a bit of good because, if it were elected as bargaining agent, the Company would screen new employees and ease out present employees in such a manner that the Union would be non-existent in one or two years.

4. Approximately two weeks prior to the election, Supervisors Billy Young and Dennis Hendrix approached employee L. B. Jones separately. Young, referring to union cards and pencils prominently displayed by Jones, asked Jones if he still believed in "that stuff" and added that the Company wouldn't have to give the Union a contract. Hendrix referred to Jones' longstanding support of the Union and asked him why he and so many other employees were dissatisfied with the Company.

5. Employee Odis Jones was chairman of the Union organizing committee and had served as the Union's observer in the 1966 election. Tom Rose, the Company's personnel manager, testified he was aware of Jones' active support for and activity on behalf of the Union. Prior to work on January 19, 1968, Jones thumbtacked prounion handbills on two "Election News" bulletin boards inside the plant. The Company maintains 25 permanent bulletin boards that are covered with glass and kept under lock and key and are used for dissemination of Company news items to employees. Two days before Jones posted the handbills, on January 17, the Company erected seven additional bulletin boards, which did not have glass fronts or locks. These boards were labeled "Election News" and were placed on stands or affixed to walls in the proximity of the permanent bulletin boards. Nowhere on these seven new boards was there any indication that their use was limited to Company propaganda.

Jones was called into Tom Rose's office after lunch on the 19th. Jones testified that Rose immediately told him he was fired for violating Company Rule No. 6 which prohibits the unauthorized posting of notices. Jones admitted placing the handbills on the Election News boards but claimed he was unaware of Rule 6, that he had never been given a copy of the Company's 26 rules, and, although he had seen a folder pertaining to these rules on a bulletin board "last year," he read only part of it. After curtly explaining Rule 6 and showing Jones a printed company of the Company's 26 rules, Rose again stated that Jones was fired and ordered him to leave his office.

Employee James Hancock testified that he tacked prounion handbills to six or seven Election News bulletin boards on the same day Odis Jones was fired and that he was observed while doing so by three foremen and by a personnel department employee. Hancock however was not disciplined.

6. On January 23, 1968, a week or so prior to the election, Foreman Junior Chaffin noticed employee Lettie Braxton's name on a union handbill and thereupon called her into his private office and asked her what had caused her to turn against the Company and for the Union. When Braxton replied that her wages were too low, Chaffin warned her that after the Union came in there

would be a lot of strikes and she would be out of a job. After further commenting that the Company wouldn't bargain with the Union, Chaffin asked Braxton whether she would rather have a job or be walking the picket line. The following day Chaffin asked Braxton if she had thought over their conversation, and when she replied she had not changed her mind, he added that if the Union came in it would cause a lot of people to suffer.

7. According to the testimony of employee Lehman Throgmartin, whom the Trial Examiner credits, shortly before the election he and his foreman, Harold Panky, discussed the firing of employee Odis Jones and the merits of unionization. Panky then stated: "Well, union or no union, if I get orders from higher up, I will have to fire you, and guys like you and Odis Jones would have to go." In a conversation the day following the election Panky again stated to Throgmartin, "Union or no union, if I get orders from higher up, I am going to have to get rid of you."

8. Two weeks after the election on February 16, 1968, a fight occurred between employees Corine Sullivan and Edna Edwards, and subsequently involved Sullivan's son Robert Thompson. All three employees were suspended by the Company pending investigation of the altercation. After interviewing employees in the area of the fight, Personnel Manager Rose determined that only employee Imogene Dickerson had witnessed the entire incident. Dickerson testified that Sullivan and Thompson were the aggressors.

The Company's initial investigation disclosed that Sullivan initiated the fracas and Thompson had continued it. The suspensions of Edwards and Sullivan were continued pending further investigation, but Thompson, whose aggressor role was clear, was discharged the day of the fight for having violated Company Rule 14 prohibiting unprovoked assaults. When further investigation turned up no new facts, Sullivan was also discharged for having violated

Rule 14 and Edwards was reinstated in her job.

## I. The § 8(a) (1) VIOLATIONS

The Company argues there is no showing of a background of employer hostility and discrimination toward unionization such as would induce in its employees a fear of reprisal for lawfully pursuing their union activities. With the exception of Foreman Chaffin's interrogation of Lettie Braxton, the Company contends there are no threats of reprisal or force or promises of benefits contained in any of the conversations found by the Board to constitute unlawful interrogations or threats. Although the Company concedes coercive interrogation by Chaffin of Braxton, it asserts this incident alone is too isolated to support enforcement of a § 8(a) (1) violation. Finally, the Company contends it was denied due process of law by the action of counsel for General Counsel in interviewing and taking affidavits from Supervisor Billy Young after the case had been investigated and after the Complaint had issued without first notifying company counsel and affording him the opportunity to be present.

We find it unnecessary to reach the question of union animus on the part of the Company for we think there is substantial evidence of the coercive nature of the interrogations of L. B. Jones and Lettie Braxton and the threats to James Hancock and Lehman Throgmartin standing alone to sustain the Board's finding of § 8(a) (1) violations without a specific finding of union animus.

Consideration of the Company's denial of due process claim requires further explication of the factual context in which the interviews of former Supervisor Billy Young by counsel for General Counsel took place. L. B. Jones asked Young on April 18, 1968, after the Complaint and Answer had been filed, to meet with a man at a local motel in order to provide a work reference for Jones. The man at the motel was an NLRB attorney; however, apparently he did not suggest or

have knowledge of the pretext engaged in by Jones to persuade Young to come to the motel. The NLRB attorney identified himself in his capacity and Young then submitted to an interview and signed an affidavit. On May 15, 1968, Young signed a second affidavit after another interview by the Board attorney.

At the hearing General Counsel called Young as a witness to testify as to conversations that he had with his immediate supervisor concerning company policies and certain actions, but not as to any § 8(a) (1) allegations. The Company objected to the receipt of any testimony from Young and made a motion that the § 8(a) (1) allegations against Young be dismissed because Young's affidavits were taken after Young had been alleged in the Complaint to be a Supervisor and was admitted to be so in the Company's answer.

The Trial Examiner agreed that fundamentals of fair play and the policy underlying General Counsel's administrative instructions required dismissal of the allegations of the Complaint as to Young. The Board, however, ruled that such a dismissal was not warranted because the NLRB attorney's conduct did not violate the Board's published procedures for taking statements from supervisors during the investigative stage of a case when the charged party is *not* cooperating with the Board's investigation as set out in NLRB Field Manual, § 10056.5:

"Where Respondent is represented by counsel or other representative and cooperation is being extended to the Region in connection with its investigation of unfair labor practice charges, the charged party's counsel or representative is to be contacted and afforded an opportunity to be present during the interview of any supervisor or agent whose statements or ac-

tions would bind a respondent. This policy will normally apply in circumstances where: (a) the charged party or his counsel or representative are cooperating in the Region's investigation; (b) counsel or representative makes the individual to be interviewed available with reasonable promptness so as not to delay the investigation; and, (c) where during the interview counsel or representative does not interfere with, hamper, or impede the Board agent's investigation.

"This policy does not preclude the Board agent from receiving information from a supervisor or agent of the charged party where the individual comes forward voluntarily, or where the individual specifically indicates that he does not wish to have the charged party's counsel or representative present. Similarly, in cases involving individuals whose supervisory status is unknown, this policy would not be applicable."

The Company argues that while Young's affidavits had no probative value, they were taken by General Counsel for the purpose of impeaching Young at the hearing had the Company put him on the stand. The Company contends the taking of these affidavits when the General Counsel was preparing for trial was in contravention of the Board's longstanding insistence that discovery procedures applicable in federal courts are inapplicable to Board proceedings. Furthermore, it is urged the General Counsel's interpretation of § 10056.5 of the NLRB Field Manual to allow the interviewing of low-ranking supervisors (whose statements bind the company equally as statements made by main representatives) without affording the charged parties an opportunity to be present, but to prohibit such interviews of main representatives, is arbitrary, capricious and violative of due process.[4]

---

4. Memorandum 68–15 of the General Counsel, issued April 18, 1968, explains that the above rule applies only to intermediate or low level supervisors or agents whose statements or actions would bind a company, and that under no circumstances will parties or main representatives (corporate officers, depart-

The Board counters with the argument that the distinction made between main representatives and lower level supervisors is reasonable and reflects the reality that in the typical unfair labor practice case the responding party is not an individual but a corporation, partnership, or labor organization, whose main representatives are akin to a party in a normal civil suit. The General Counsel is charged with the statutory responsibility in the public interest to investigate, and if a complaint issues, to prosecute unfair labor practice cases. In those instances in which the charged party is not cooperating with this investigation, as in the instant case, it is likely that the investigation would be seriously impeded if the charged party's counsel were to be first notified and then afforded the opportunity to be present, for employees and supervisors might be hesitant to talk under such circumstances. Finally, reliance is placed on the holding in NLRB v. National Survey Service, Inc., 361 F.2d 199, 206 (7th Cir. 1966), that company counsel may not ask the employee to furnish him with a copy of statements given to a Board agent. Thus, it is contended, the Company has no right to be present when the statement is taken, though it can make its own investigation, and the Board's regulations to this effect should be upheld as they are designed only to insure that General Counsel's investigation is not hampered.

■ While we disapprove any role the Board may have had in luring Supervisor Young by false pretenses to the motel for an interview, the taking of these two interviews without the presence or consent of Company counsel did not prejudice the Company since these affidavits were not placed in evidence. The Board's finding of a § 8(a) (1) violation based on Young's interrogation of L. B. Jones was based solely on the testimony of Jones. Supervisor Young was called to the stand by General Counsel but he was asked only about unrelated matters. Furthermore, there is no indication whatsoever that General Counsel's case was in any way based on information developed in the course of these two interviews. Since the Company was not prejudiced by the Board's interviews of Young, we do not pass on the validity of § 10056.5 of the NLRB Field Manual.

## II. THE § 8(a) (3) AND (1) VIOLATIONS

### A. The Discharge of Corine Sullivan

The unfair labor practice finding as to Corine Sullivan can be sustained if there is substantial evidence that the stated reason for her discharge was pretextual and that Sullivan was discharged for her union activity. The Trial Examiner so concluded on the basis of a minor discrepancy between Dickerson's and Edwards' accounts of how the fight began. The Board upheld the Trial Examiner's finding that Sullivan furnished the only truthful account of the episode at the hearing and during the Company's investigation, pointing to minor discrepancies in the testimony of Edwards and Dickerson and in the testimony of Edwards and Rouse, an employee who saw the fight after it was in progress, and to Dickerson's membership in the Loyal Employees Committee.

The Board contends that the contradictions in the stories, the height-weight advantage Edwards held over Sullivan of several inches and 60 pounds, and the fact that Sullivan's severe injury was the only wound resulting from the fight, constitute substantial evidence that the Company could not have reasonably believed that Sullivan was the aggressor. The Board also argues that since the asserted reason for Sullivan's discharge was untrue, the Board could properly infer under the circumstances of this case that the Company's real reason was an unlawful one, citing Shattuck Denn Mining Corp. v. NLRB, 362 F.2d 466, 470 (9th Cir. 1966). This inference is reasonable and entitled to enforcement, it is

ment heads, international representatives, union presidents, etc.) be interviewed

without the consent of counsel or representative of record.

asserted, because of the past union animus of the Company and the fact that Edwards, the member of the Loyal Employees Committee, was reinstated while Sullivan, the member of the Union organizing committee, was fired.

 We do not think there is substantial evidence to support the Board's finding of a § 8(a) (3) and (1) violation. We recognize that discriminatory treatment of employees by their employer, motivated in whole or in part by their union or protected activities, violates § 8(a) (3) and (1) and that "[t]he mere existence of valid grounds for a discharge is no defense to a charge that the discharge was unlawful, unless the discharge was predicated solely on those grounds, and not by a desire to discourage union activity." NLRB v. Symons Mfg. Co., 328 F.2d 835, 837 (7th Cir. 1964). Accord, Williams Motor Co. v. NLRB, 128 F.2d 960, 964 (8th Cir. 1942). We are also cognizant that it is not the function of this Court to pass on the credibility of witnesses, weigh the evidence, or reject reasonable Board inferences simply because other inferences might also be drawn, and that the Board's findings of fact must often depend on circumstantial as well as direct evidence. See NLRB v. Melrose Processing Co., 351 F.2d 693, 698 (8th Cir. 1965).

Nonetheless, we are quite skeptical that the discrepancies in the testimony of Edwards and Dickerson were of such significance as to discredit the testimony of these two witnesses. Even assuming these discrepancies were also apparent in their statements to the Company during its investigation of the fight, an assumption of questionable validity since the Trial Examiner himself did not detect two of the minor discrepancies turned up by the Board, the credibility of Edwards and Dickerson were not so undermined that we can conclude there was substantial evidence that the Company could not have reasonably believed Sullivan was the aggressor. Furthermore, there is no evidence that the Company has ever discriminated in the application of Rule 14 which requires the discharge of any employee starting a fight. We conclude there is not substantial evidence to support the Board's finding of a § 8(a) (3) and (1) violation with regard to the discharge of Corine Sullivan and we deny enforcement of the Board's Order on this charge.

### B. The Discharge of Odis Jones

Jones was discharged for violating Company Rule 6, which prohibits the "[u]nauthorized posting of notices or marking on the walls or other company property." Jones admitted posting handbills on the Election News bulletin board and the Trial Examiner found he had knowledge of Rule 6; however, Jones protested it was not clear that the rule applied to the Election News bulletin boards.

The Company argues it can make any employee action whatsoever a rule violation and that it can inflict any penalty it deems necessary on a rule violator. Thus, the Company contends it had an absolute right to discharge Jones for violation of Rule 6, even if his violation were unintended and trivial, so long as his protected union activity was not the motivating cause for discharge. Since Jones admitted posting the handbills on the Election News bulletin board and since the Company deems this a violation of Rule 6, it is contended that there was a justifiable ground for Jones' discharge and that to enforce the Board's finding of a § 8(a) (3) and (1) violation we must find there is substantial evidence that this ground was a mere pretext and not the moving cause for discharge.

The Trial Examiner based his finding of a pretext on the following grounds: (1) the precipitate nature of the Company's inquiry into the facts; (2) the relatively trivial nature of the violation; (3) his crediting of Jones' testimony that Personnel Manager Rose informed him he was fired even before Jones admitted putting material on the boards; and (4) employee Hancock's testimony

that he too placed handbills on Election News bulletin boards on the same day in the presence of several foremen, yet was not disciplined.

■ The Company takes issue with this finding and correctly points out that although the credibility of witnesses is an issue to be determined by the Trial Examiner and the Board as triers of facts, under certain circumstances "the uncorroborated testimony of an untrustworthy and interested witness, who stands to profit from a back pay award, may be held under such facts and circumstances not to constitute substantial evidence on the record as a whole." NLRB v. Barberton Plastics Products, Inc., 354 F.2d 66, 69 (6th Cir. 1965). See also NLRB v. Arkansas Grain Corp., 392 F.2d 161, 167 (8th Cir. 1968). In *Barberton Plastics*, where the Sixth Circuit overturned the trial examiner's credibility determination crediting the discharged employee, the employee had been "guilty of making false statements on more than one occasion" and it was clear that he had committed acts of insubordination, inefficiency and misconduct. Such exceptional circumstances do not exist here, for Jones was a veteran, highly valued employee charged with his first violation of company rules. Likewise, no such exceptional circumstances are present to discount the testimony of Hancock, whose statements, which might be characterized as anti-Company, are in any event not self-serving.

■ Regardless of whether Personnel Manager Rose immediately told Jones he was fired or not, we think Jones' discharge was handled precipitately and,

when coupled with the trivial nature of the violation, it affords substantial evidence that the alleged rule violation was a mere pretext for discharging Jones because of his union activities. Rule 6 is sufficiency ambiguous that Jones could reasonably believe and did in fact believe it did not apply to the Election News bulletin boards. The boards had been put up only two days before Jones posted the handbills, were of a temporary nature and for the explicit purpose of disseminating election literature, and did not indicate they were limited to company propaganda. We agree with the Board that it is inconceivable that the Company would discharge a veteran employee without any warning for a minor infraction of a rule of uncertain applicability. The Board's inference of discriminatory motivation is supported by substantial evidence and its finding of a § 8(a) (3) and (1) violation is entitled to enforcement.

## III. THE BREADTH OF THE BOARD'S ORDER

The Company also challenges the breadth of the Board's Order.[5] Specifically, it contends the "in any other manner" phrase in clause 1(d) should be changed to "in any like or related manner" and the "or any other labor organization" phrase should be deleted from clauses 1(a) and (c).

■ The Board urges that the Company is barred from contesting the breadth of its Order at this belated stage of the proceedings because this specific objection was not argued before the Board. The Company excepted to "The Recommended Order in its entirety

---

5. The Board's Order in pertinent part reads:

"1. Cease and desist from

"(a) Coercively interrogating employees concerning their sympathies and activities with respect to the Union or any other labor organization;

\* \* \* \* \*

"(c) Discouraging membership in the Union or any other labor organization by discharging or otherwise discriminating against employees with respect to hire

or tenure of employment or any term or condition of employment;

"(d) In any other manner interfering with, restraining or coercing employees in the exercise of their right to self organization to form, join or assist labor organizations, or to bargain collectively through representatives of their own choosing and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection;"

\* \* \* as said recommended Order is against the preponderance of the evidence and the law." The Board contends this exception is too vague to fulfill the requirements of § 10(e) of the Act or Board Rule § 102.46(b). We agree.

Section 10(e) of the Act, 29 U.S.C. § 160(e), in pertinent part reads:

"No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."

The Rules and Regulations of the NLRB, 29 C.F.R. § 102.46(b) further provide:

"Each exception (1) shall set forth specifically the questions of \* \* \* law \* \* \* to which exceptions are taken \* \* \* and (4) shall state the grounds for the exceptions and shall include the citation of authorities unless set forth in a supporting brief. Any exception to a ruling, finding, conclusion, or recommendation which is not specifically urged shall be deemed to have been waived."

 The policy underlying § 10(e) is that "of affording the Board opportunity to consider on the merits questions to be urged upon review of its order." Marshall Field & Co. v. NLRB, 318 U.S. 253, 256, 63 S.Ct. 585, 586, 87 L.Ed. 744 (1943). "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objections made at the time appropriate under its practice." United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952). The Supreme Court reaffirmed this policy in NLRB v. Ochoa Fertilizer Corp., 368 U.S. 318, 322, 82 S.Ct. 344, 347, 7 L.Ed. 2d 312 (1961), where it stated with regard to § 10(e):

"At least when the Board has not 'patently traveled outside the orbit of its authority,' [National Labor Relations] Board v. Cheney California Lumber Co., 327 U.S. 385, 388, our cases have uniformly held that in the absence of a showing within the statutory exception of 'extraordinary circumstances' the failure or neglect of the respondent to urge an objection in the Board's proceedings forecloses judicial consideration of the objection in enforcement proceedings." (footnote omitted.)

In the Marshall Field case, the Company's only objection to the subsequently contested part of the trial examiner's report was that the examiner had erred "in making each and every recommendation." The Court ruled that § 10(e) precluded its consideration of the objection on review because "[s]uch a general objection did not apprise the Board that petitioner intended to press the question now presented, and may well account for the Board's failure to consider this question in its decision and to make findings with respect to it." Marshall Field & Co. v. NLRB, 318 U.S. at 255, 63 S.Ct. at 586.

Similarly, in NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953), where "the Company objected that the recommendations as to the remedy were contrary to, and unsupported by, the evidence and contrary to law" in its exception, the Supreme Court refused to consider the objection because the exception did not give adequate notice that the Company intended to press the specific issue it raised for the first time before the Supreme Court. Id. at 350, 73 S.Ct. at 290.

 The Company's general objection in the instant case is too vague to satisfy the requirement of § 10(e) and must be deemed waived unless extraordinary circumstances can be shown. The Company alleges no extraordinary circumstances and the breadth of the Order itself would not seem to provide them. In Ochoa Fertilizer, supra, where the

consent order prohibited certain actions both by the employer against the union or any other labor organization and by the union against the employer or any other employer, the Supreme Court found that the objection to the order was barred by § 10(e) as no extraordinary circumstances existed. Section 10(e) has also been held to bar a company challenge to the validity of an order almost identical to the "in any other manner" phrasing of clause 1(d) in the instant case in NLRB v. Electro Plastic Fabrics, Inc., 381 F.2d 374, 376 (4th Cir. 1967). Consequently, the general phrasing "any other labor organization" and "in any other manner" of the Order in the case at bar does not provide the extraordinary circumstances needed to invoke the exception to the § 10(e) proscription.

 Nonetheless, since the Company's objection to the breadth of the "or any other labor organization" phrases of the Order is frequently made, we think it appropriate to comment on the Supreme Court's decision in Communication Workers of America, AFL–CIO v. NLRB, 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed.2d 896 (1960). In *Communication Workers* two unions violated § 8(b) (1) (A) by coercing company employees in the exercise of their right to refrain from or discontinue participation in a strike. The Supreme Court held that since the unions were not found to have engaged in violations against employees of any other employer, there was no justification or necessity for extending coverage of the order generally by inclusion of the phrase "any other employer." Notwithstanding this holding and without attempting to distinguish it, several cases have upheld the validity of "or any other labor organization" orders when the unfair labor practices occurred during a unionization campaign on the ground that the Board could believe the unfair labor practices were not motivated by a desire to discourage membership in the particular union involved, but by a wish to discourage any unionization of the Company's employees. NLRB v.

Standard Metal Fabricating, 297 F.2d 365, 367 (8th Cir. 1961); Marshfield Steel Co. v. NLRB, 324 F.2d 333, 339 (8th Cir. 1963); P. R. Mallory & Co. v. NLRB, 400 F.2d 956, 959–960 (7th Cir. 1968), cert. denied, 394 U.S. 918, 89 S.Ct. 1191, 22 L.Ed.2d 452 (1969); but see NLRB v. J. W. Mays, Inc., 356 F. 2d 693, 698 (2d Cir. 1966). The distinction seems to be that since the relationship between the company and a defeated union is a continuing one only if the same union again seeks to organize the employees, the order can legitimately be made broader to protect any other unions which might try to organize the employees based on the strong possibility that the company's past unfair labor practices were intended to obstruct unionization in general. We feel the Board could reasonably make such a finding in the instant case and, therefore, the "or any other labor organization" phrase of the Order is valid.

The Board's Order is enforced except as to the Corine Sullivan Complaint, which is denied enforcement.